**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **ODISHO N. DAVID,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 15 C 11484** |
| **V.** ) | |
| ) | **Magistrate Judge Mason** |
| **NANCY A. BERRYHILL, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Odisho David ("Claimant") brings this motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Claimant's claim for Supplemental Security Income ("SSI"), finding him not disabled under 42 USC § 1382c(a)(3)(A). The Commissioner has filed a cross-motion for summary judgment asking the court to uphold the decision of the Administrative Law Judge ("ALJ"). The Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 1383(c) and 405(g). For the reasons set forth below, Claimant's request for summary judgment (Dkt. 22) is granted and the Commissioner's request (Dkt. 29) is denied.

## I.    BACKGROUND

### A.    Procedural History

On April 9, 2012, Claimant filed an application for SSI, alleging disability since January 1, 2009 due to torn ligaments in the left leg, pain in the right shoulder, and problems with fluid in the ear. (R. 33, 102.) The Social Security Administration denied

1

his claim initially on June 13, 2012, (R. 81-88, 98-102), and upon reconsideration on October 10, 2012.  (R. 89-97, 112-116.)  Claimant filed a timely request for a hearing on December 7, 2012.  (R. 117.)  On May 22, 2014, Claimant appeared with counsel before ALJ Asbille.  (R. 46.)  On May 30, 2014, ALJ Asbille issued a written decision denying Claimant's request for benefits.  (R. 33-40.)  Claimant filed a timely request for review (R. 24-25), and on October 20, 2015, the Appeals Council denied this request, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-7.)  This action followed and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

### B.    Medical Evidence

#### 1.    Treating Physician Records Before the ALJ

The medical records reveal that Claimant was treated throughout the relevant period at various Cook County Health and Hospitals System locations for problems and follow-up related primarily to diabetes mellitus.

In January of 2013, Claimant was diagnosed with Type 2 diabetes mellitus after testing revealed elevated blood glucose levels at 12.60%.  (R. 467.)  The doctors with Cook County Health and Hospitals System Network Diabetes Program ("NDP") prescribed him insulin and two anti-diabetic medications, Glipizide and Metformin.  (*Id.*)  He was referred for an ophthalmology screening and to a primary care provider, and was advised to follow up in three months.  (R. 370, 374, 467.)

In March 2013, Claimant established care with primary care physician Dr. Khosropour at the Family Practice Outpatient facility affiliated with Cook County Health and Hospitals System.  (R. 447.)  He complained of lightheadedness when getting up

quickly or taking deep breaths, bilateral leg pain that worsened with movement and high blood sugar, and sores in his mouth that improved as sugar levels decreased. (*Id.*) Claimant's blood sugar levels remained elevated at the time. (R. 449.) His blood pressure was also elevated. (*Id.*) Otherwise, a physical exam revealed mostly normal results. (*Id.*) Dr. Khosropour did note rapid speech, and that Claimant changed subjects very quickly. (*Id.*) Claimant was to continue with insulin injections "to bring sugars down" so that his oral medication would be more effective. (*Id.*) He was directed to continue tracking his blood sugar levels and bring in the results in two weeks for follow up. (*Id.*)

A few weeks later, Claimant's sugar levels were "much better" after dosage adjustments were made by the NDP treaters, but were still high in the mornings. (R. 450, 468.) Overall, Claimant was "feeling well," though he complained of occasional hypoglycemic episodes. (*Id.*) Claimant's problems were noted as diabetes mellitus without complications and hyperlipidemia. (R. 450-51.) His blood pressure was normal, as were the results of a respiratory and cardiovascular exam. (R. 452.)

On May 20, 2013, Claimant returned to see Dr. Khosropour for follow up. (R. 394.) He complained of tension over his right shoulder. (*Id.*) Upon exam, Dr. Khosropour observed a supple knot on the right trapezius that "reproduces pain when pushed." (R. 396.) His blood pressure was within normal limits. (*Id.*) Claimant's fasting blood sugar was "very elevated," so Dr. Khosropour increased his Metformin and insulin dosages. (*Id.*) Claimant's microalbumin level was high, so he was started on a low dose of Enalapril. (*Id.*) He was educated about the importance of diet and exercise. (*Id.*) Claimant's hyperlipidemia was well controlled and he was to continue on

Lovastatin.  (*Id.*)  For the shoulder tension, Dr. Khosropour recommended massage, stretching, and a heating pad.  (*Id.*)  Claimant was directed to return in three months.  (*Id.*)  It was noted that his ophthalmology appointment was coming up.  (*Id.*)

His glucose levels had "improved" by a June 5, 2013 visit with the NDP treaters, but were still not at the target level.  (R. 469.)  The nurse recommended an increase in his Metformin dosage if tolerable.  (*Id.*)  Claimant presented at the ophthalmology screening clinic in July 2013, at which point there was no indication of diabetic retinopathy observed.  (R. 470.)  Also around that time, Claimant underwent testing in the ER for complaints of chest pain and shortness of breath.  (R. 416, 483.)  A chest x-ray revealed no acute cardiopulmonary findings.  (*Id.*)  A stress test revealed normal exercise tolerance.  (R. 486-87.)

Claimant returned to see Dr. Khosropour in August 2013, complaining of weight gain, hypoglycemia before lunch time, and bilateral achy leg pain.  (R. 456.)  He denied chest pains or shortness of breath, and reported he had been compliant with his medication.  (*Id.*)  A physical exam was normal and Claimant's glucose levels had improved.  (*Id.*)  Dr. Khosropour assessed "very tightly controlled" diabetes (and adjusted Claimant's dosage), as well as controlled hypertension.  (*Id.*)  She recommended that Claimant discontinue Lovastatin, in hopes his leg pain would improve.  (*Id.*)

In September 2013, Claimant told the NDP nurse that he was taking his insulin, but was only eating one meal a day.  (R. 471.)  She helped him set goals and made additional recommendations for improvement.  (*Id.*)

In November 2013, Claimant presented to Dr. Khosropour with no complaints of hypoglycemic episodes since his dosage changes.  (R. 460.)  Claimant did complain of pain in the parotid area near his ear, accompanied by a salty taste in his mouth when pushing on that area.  (*Id.*)  He had also been experiencing intermittent lower back pain, but denied numbness or weakness.  (R. 461.)  Dr. Khosropour observed decreased range of motion in his back due to pain, as well as pain to palpation.  (R. 463.)  Dr. Khosropour planned to refer Claimant to an ENT for the parotid pain and to physical therapy for back pain.  (*Id.*)  As for the diabetes, Dr. Khosropour noted that it was "controlled too tightly" with his decreased insulin dosage.  (*Id.*)  She recommended Claimant start the oral medication Glyburide.  (*Id.*)  Claimant's hypertension and hyperlipidemia were well controlled.  (*Id.*)  Also around that time, Claimant had an ophthalmology appointment to get glasses.  (R. 472.)

Results from an aurical tone audiometer in April 2014 show Claimant's hearing abilities were within normal limits for both ears.  (R. 488.)

## 2.    Treating Physician Records Submitted to the Appeals Council[1]

In December 2013, Claimant was seen by a physical therapist for complaints of low back pain and bilateral hip pain beginning six months prior.  (R. 518.)  He reported his pain ranged from 2/10 to 9/10 and increased when sitting longer than ten minutes, lying on his side, bending, and lifting.  (*Id.*)  It decreased upon standing, positional changes, and with ibuprofen.  (*Id.*)  The therapist observed faulty body mechanics, lower extremity flexibility deficits, limited and painful lumbar active range of motion, and decreased hip strength contributing to increased joint stress.  (R. 519.)  She opined that

---

[1]  The following treating physician records were not a part of the record at the time the ALJ issued his decision.  Instead, they were submitted to the Appeals Council in connection with Claimant's appeal.  (R. 6.)

Claimant's symptoms were consistent with lower lumbar pathology and greater trochanteric bursitis, possibly due to starting an exercise regime after being diagnosed with diabetes. (*Id.*) His prognosis was good and continued physical therapy was recommended twice a week for four weeks. (*Id.*)

Claimant returned for physical therapy throughout January 2014. (R. 512-17.) By January 21, 2014, Claimant's lower back was "overall feeling better." (R. 514.) The physical therapist reported that Claimant demonstrated improved lumbar active range of motion, functional mobility, and tolerance to core and hip strengthening. (R. 515.) Claimant experienced stiffness in the lower back and reproduction of left lower extremity symptoms, but symptoms were reduced after manual mobilizations to his lumbar spine and hip joint. (*Id.*) The plan was to continue with physical therapy to "improve functional strength and range of motion and return patient to prior level of function." (*Id.*) By the end of the month, Claimant was reporting that he was feeling a little bit better after each therapy session. (R. 512.)

The records submitted to the Appeals Council include the full audiological report from Claimant's April 2014 testing. (R. 501-03.) The report reveals that Claimant complained of decreased hearing sensitivity, drainage, and pain in the left ear for the past three to four years. (R. 501.) Tests revealed mildly decreased hearing levels on the left ear. (R. 502.) Claimant's speech discrimination was excellent on the right ear at normal conversational level and at elevated speech conversational level on the left ear. (*Id.*) The audiologist concluded that Claimant would experience difficulties discerning some/most sounds on both ears, greater on the left, when sounds were presented at or

below normal speech conversational levels.  (*Id.*)  She recommended follow-up in six months and a hearing aid in the left ear pending medical clearance.  (R. 502-03.)

Claimant was treated in the emergency room on May 14, 2014 for depression, insomnia, and dysphagia.  (R. 492-95, 499.)  Chest imagining showed no acute pulmonary findings.  (R. 499-500.)  He was prescribed Trazodone, and advised to follow-up with the psychiatry clinic and the GI clinic.  (R. 493.)

### 3. Agency Consultants

Back in May 2012, consultative physician Dr. Joseph Youkhana examined Claimant at the request of the Social Security Administration.  (R. 327-38.)  Claimant's chief complaints were left leg pain, right shoulder pain, and fluid in the left ear.  (R. 327.)  Claimant stated that he fell and injured his left leg two years prior to the examination, and his pain had been progressing ever since.  (*Id.*)  It was worse upon walking three blocks, climbing stairs, twisting, turning, or standing for a long time.  (*Id.*)  As for his right shoulder, he explained that it was very stiff and he could not reach over his head.  (*Id.*)  He described the pain as constant and sometimes sharp.  (*Id.*)  Claimant also complained that anytime he squeezed below his left ear, he felt a salty taste in his mouth.  (*Id.*)  He attributed this to a cyst he had behind his left ear fifteen years prior.  (*Id.*)  He also "always feels like there is water in his left ear," which affects his hearing.  (R. 328.)  Claimant said that he had been a smoker for thirty years, but quit two weeks prior.  (*Id.*)  He was not taking any medications other than occasional over-the-counter pain medicine.  (*Id.*)  He last worked in heating and cooling maintenance from 1993 to 2007.  (*Id.*)

Upon physical examination, Dr. Youkhana saw no fluid in the ears and no cyst. (R. 328.)  The Claimant could "hear him without talking loud or without needing the questions repeated," though he noted that Claimant was speaking a "little bit loud."  (*Id.*) A musculoskeletal exam revealed a full painless range of motion in degrees of all joints with the exception of "mildly decreased range of motion of the left knee and right shoulder with stiffness."  (R. 328, 333-36.)  Claimant exhibited moderate difficulty walking on his toes, heels, and squatting, and mild difficulty getting on and off the exam table.  (R. 333.)  A straight leg test was negative.  (*Id.*)  Dr. Youkhana did note that Claimant limped due to his leg pain, but that he did not use an assistive device.  (R. 328, 333.)  He saw no heat, redness, swelling, thickening or deformities of any joints. (R. 328.)  Claimant had normal grip strength bilaterally, and a normal ability to grasp and manipulate with both hands.  (*Id.*)  A neurological exam revealed that strength, sensation and reflexes were symmetric and normal throughout.  (R. 329.)  Motor strength was 5/5.  (*Id.*)  There was no evidence of cervical or lumbar root compression or neuropathy.  (*Id.*)  All other systems were noted as normal.  (R. 328-29.)  An x-ray of the left knee was unremarkable.  (R. 338.)

Dr. Youkhana listed his clinical impressions as chronic left leg pain, right shoulder stiffness and pain, and fluid in the left ear, despite a "normal" ear examination.  (R. 329.)

On June 12, 2012, Dr. Bharati Jhaveri reviewed the file as it existed at that time and determined that Claimant retained the residual functional capacity ("RFC") to occasionally lift fifty pounds, frequently twenty-five pounds; could stand, walk or sit for six hours in an eight-hour day; and had an unlimited ability to push and pull.  (R. 85.)

Further, he concluded Claimant could frequently kneel, crawl, climb ramps, stairs, ladders, ropes and scaffolds; occasionally balance, stoop, and crouch; and could engage in only limited right overhead reaching. (R. 85-86.) He found no other manipulative, visual, communicative, or environmental limitations. (R. 86.) He based his conclusions primarily on the results of the consultative examination. (R. 85-86.)

Claimant underwent pulmonary function testing in October 2012 in connection with his request for reconsideration. (R. 353-56.) Testing showed mild to moderate COPD. (R. 353.) The doctor noted Claimant had difficulty doing the test procedures and gave his best effort. (*Id.*) He exhibited shortness of breath, wheezing, and bouts of coughing. (*Id.*) The doctor also noted that claimant had difficulty in doing a "blast" and sounded congested. (*Id.*)

Dr. Charles Kenny reviewed the file at the reconsideration level and reached the same conclusions regarding Claimant's RFC as found by Dr. Jhaveri. (R. 93-95.)

### C.    Claimant's Testimony

Claimant appeared at the hearing with counsel and testified as follows. At the time of the hearing, Claimant was 49 years old. (R. 50.) He was 5'5'' tall, weighed 182 pounds, and right-handed. (*Id.*) He was single and living with his mother on the second floor of a building. (R. 50-51.) Although he has a driver's license, he had not driven in a couple of years, and took public transportation to the hearing. (R. 51.) Claimant dropped out during his second year of high school to help support his family and never received a GED. (*Id.*)

Claimant has not worked since he filed for SSI on April 9, 2012, and his last earnings appeared to be in 2005. (R. 51.) According to Claimant, his diabetes prevents

him from working due to shaking, blurry vision, and sweating spells when his sugar crashes. (R. 52.) He reported he had to go to the hospital every four months or so for blood sugar problems. (*Id.*) While at the hospital, his blood pressure and sugar levels are checked. (R. 52-53.)

Claimant also explained that he has had trouble breathing for years due to swelling of the throat, tongue, and gums. (R. 53.) If he goes up a flight of stairs or walks for too long, he breathes heavily and gasps for air. (R. 54.) He had not yet received any treatment for his COPD and was not using an inhaler, but reported he had an appointment coming up. (*Id.*) He also had been having trouble swallowing recently and was supposed to have an MRI soon. (R. 52-53.)

Claimant testified that his condition has worsened over the past year because his dizziness, shakiness, and low sugar spells have gotten worse. (R. 53-54.) His sugar crashes anywhere from three to four times a week and it can take up to a half an hour before he is able to stop shaking and sweating. (R. 59.) Claimant does not do any housework, such as sweeping, washing dishes, laundry, or grocery shopping due to his dizzy spells. (R. 55-56.) He has no trouble showering because he has a standup shower. (R. 55.) The farthest he has walked in the last month was a couple blocks at a slow pace. (R. 56, 61.) It is difficult for him to walk any further than a couple of blocks because of the pain in his ankles, knees, hips, and lower back. (R. 56-57.) Claimant can only stand for a couple of minutes before having to sit down due to pain. (R. 57.) He also experiences pain after sitting for long periods of time. (R. 57.) Stairs are also difficult due to pain and breathing difficulties. (R. 58.) Claimant cannot lift a gallon of

milk because of pain and swelling in his shoulder, but has no problem operating a zipper on a jacket or buttoning buttons.  (R. 57-58.)

Claimant said he has trouble sleeping due to the constant pain.  (R. 55.)  It takes him an hour to get out of bed in the morning.  (R. 55.)  During that hour he stretches, "gets his head together," and takes a "breather" after his legs and hands tingle during the night.  (R. 59.)  On a typical day, he stays at home watching television and monitoring his sugars.  (R. 57.)  He rarely leaves the house.  (R. 54.)

Claimant testified that he may be depressed due to his diabetes and reported talking to himself and hearing things.  (R. 53.)  He was not seeing a psychiatrist or taking medication at the time, but had an appointment scheduled.  (*Id.*)  He denied homicidal or suicidal ideations.  (R. 54.)

Claimant also testified briefly about fluid issues in his left ear.  He explained that if he pushes near that ear, a salty liquid spills into his mouth.  (R. 59-60.)

### D.    Medical Expert's Testimony

Medical Expert Dr. Ashok G. Jilhewar (the "ME") also testified at the May 22, 2014 hearing.  He first commented on what he viewed as deficiencies and discrepancies in the medical records.  (R. 61.)  The ME noted that there was a lack of treatment records for most of the symptoms described by Claimant.  (*Id.*)  For example, although Claimant testified to hypoglycemic episodes three times a week, there were no treatment records showing the insulin dosage/diet changes one would expect for such frequent episodes.  (*Id.*)  The ME also pointed out a discrepancy concerning Claimant's height (5'5" vs. 5'7"), which would prove relevant to whether Claimant met the listing for COPD.  (R. 61-62.)  Also missing from the record according to the ME were records

form the three ER visits Claimant testified to over the past year.  (R. 63.)  The ME also explained that despite Claimant's complaints of shoulder and knee pain, he saw no treatment records regarding those areas other than a brief mention by the consultative examiner and once by Dr. Khosropour.  (R. 63-64, 71.)

Next, the ALJ asked the ME to outline Claimant's impairments.  (R. 64.)  The ME testified that Claimant suffered from mild COPD as evidenced by the pulmonary function testing.  (*Id.*)  However, the ME noted that Claimant had not yet received any treatment for COPD or exhibited any related symptoms at his diabetic follow-up appointments.  (*Id.*)  Further, the results indicated that Claimant had post-med significant improvement in FVC/FEV1, which Dr. Jilhewar said was a good sign.  (R. 69.)

Claimant also suffers from Type 2 diabetes, diagnosed in January 2013.  (R. 64.)  The ME explained that with insulin management, Claimant's hemoglobin A1C level fell from 12.6 to 9.0 within four months.  (R. 65.)  Again, the ME saw no records of hospitalizations for diabetic ketoacidosis, uncontrolled diabetes, or hypoglycemia.  (*Id.*)  He also found no indication of diabetes related complications, such as peripheral neuropathy, diabetic retinopathy, or diabetic nephropathy.  (*Id.*)

Additionally, Claimant had symptoms of lightheadedness, but there was only one notation of that in the record.  (R. 65.)  The ME described the ophthalmology records, and again noted there was no diabetic retinopathy or cataracts.  (R. 65-66.)  The ME stated that the visual symptoms described by Claimant could have occurred at the onset of his diabetes because his blood sugar was so high and left untreated, though there was no documentation of such symptoms.  (R. 66.)  The ME also commented that Claimant is mildly obese.  (*Id.*)  The ME did not find the symptoms of shoulder or knee

pain to amount to medically determinable impairments because the durational requirement was not met. (*Id.*) He did point out notations from the consultative exam indicating Claimant was limping on the left leg because of pain and had moderate difficulty in heel/toe walking, squatting, and tandem walking. (*Id.*) Additionally, Claimant's right shoulder abduction was only 90 degrees, where the normal is 150 degrees. (*Id.*) The ME explained that the Claimant's exercise capacity was normal for his age based on the results of the stress test. (R. 67.)

The ME testified that the audiogram performed in April 2014 revealed "borderline normal" results. (R. 68.) There was no documentation of any difficulty in word recognition at that time. (*Id.*) The speech reception test results were 40 decibels at a higher frequency and 20 decibels at a lower frequency, which falls within the normal range of 20-40. (*Id.*)

According to the ME, the record before him did not support a finding that Claimant would meet any listings. (R. 67.) He did not agree that Claimant would satisfy the listing for COPD because his results were only mildly abnormal. (R. 68.) As for Claimant's RFC, the ME would limit him to light work due to his insulin management. (R. 67.) He could not work on ladders, ropes or scaffolds, and must avoid unprotected heights, hazards, and concentrated exposure to pulmonary irritants and extreme temperatures as a result of his COPD. (R. 67-68.)

Upon cross-examination, the ME explained that there was nothing in the record specifically refuting Claimant's testimony, but rather there was simply a lack of evidence to support his testimony. (R. 74.)

### E.     Vocational Expert's Testimony

Vocational Expert Grace Gianforte (the "VE") also provided testimony at the hearing. The ALJ first asked the VE to consider an individual of Claimant's age, education, and work experience that was limited to light work with no exposure to ladders, ropes, scaffolds, unprotected heights, dangerous/moving machinery, pulmonary irritants, extreme cold, humidity, or heat. (R. 75.) When asked if there would be jobs such an individual could perform, the VE explained that he could perform the light, unskilled jobs of clerical stock checker (2,000 jobs available regionally, 20,000 nationally), a route clerk (1,500 regionally, 15,000 nationally), or bakery worker (1,500 regionally, 15,000 nationally). (R. 75-76.) The VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles. (R. 76.)

On cross-examination, the VE testified that these positions would all require approximately six to eight hours of standing a day. (R. 76.) The VE opined that an individual who could only stand for two to three hours per day would be precluded from employment in the particular fields she listed. (R. 76-77.) When asked if a person who can only sit for forty-five minutes at a time out of every sixty minute period could perform sedentary work, the VE replied that the most important factor in that situation would be whether the individual could remain on task while alternating between sitting and standing. (R. 77.) A person who would have to walk away from their workstation to obtain relief would have difficulty sustaining unskilled, sedentary work. (*Id.*)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940

(7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion."  *Clifford,* 227 F.3d at 872.  The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.    Analysis under the Social Security Act

In order to qualify for SSI, a claimant must be "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of

not less than twelve months." 42 U .S.C. § 1382c(a)(3)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ applied this five-step analysis. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since the application date of April 9, 2012. (R. 35.) At step two, the ALJ determined that Claimant had the following severe impairments: COPD and diabetes mellitus. (*Id.*) At this step, the ALJ also discussed Claimant's history of obesity, alleged hearing limitations, and complaints of leg and shoulder pain, but determined those ailments did not amount to severe impairments under the regulations. (R. 35-36.) Next, at step three, the ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 36.) The ALJ specifically addressed why Claimant fell short of meeting Listing 3.02, covering chronic respiratory disorders, and Listing 9.00, related to endocrine disorders such as diabetes. (*Id.*)

The ALJ went on to find that Claimant has the RFC to perform light work as defined in 20 C.F.R 416.967(b), except he can never climb ladders, ropes or scaffolds, work with or near unprotected heights or moving machinery, and must avoid concentrated exposure to pulmonary irritants, extreme cold, and extreme humidity.  (R. 37-39.)  At step four, the ALJ found that Claimant did not have any relevant past work. (R. 39.)  However, at step five, the ALJ found that considering Claimant's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that Claimant could perform, such as clerical stock checker, routing clerk, and bakery worker.  (R. 39-40.)  As a result, the ALJ found that Claimant had not been under a disability since April 9, 2012.  (R. 40.)

Claimant now argues that the ALJ erred by: (1) failing to make a determination regarding the credibility of his subjective allegations; (2) ignoring a functional restriction that the state agency medical consultants proposed related to overhead reaching; and (3) failing to resolve a conflict between the VE's testimony and information that was published in the Dictionary of Occupational Titles.[2]  Additionally, Claimant argues that the Appeals Council erred in failing to find that new and material evidence would not have changed the ALJ's decision.

### C.  The ALJ Failed to Make a Proper Credibility Determination Regarding Claimant's Allegations.

---

[2] Claimant also initially argued that the ALJ erred in finding he would not suffer any limitations related to his hearing impairment.  (Cl.'s Opening Brief at 12-14.)  In his reply, Claimant acknowledged that his argument on this point was based on evidence that was presented to the Appeals Council, but not to the ALJ.  (Reply at 6-7.)  As such, Claimant conceded this point to the Commissioner and no further comment is warranted.

Claimant argues that the ALJ failed to follow SSR 96-7p (now SSR 16-3p) because he did not make an explicit finding as to how credible or non-credible he found Claimant's subjective allegations to be. The Court agrees.

At the outset, we note that the Administration has recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (March 28, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id*. at *1. Though SSR 16-3p post-dates the ALJ's ruling in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999).

As before, under SSR 16-3p, the ALJ must carefully consider the entire case record and evaluate the intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities. SSR 16-3p, 2016 WL 1119029 at *2. In making such a determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995). Rather SSR 16-3p requires the ALJ to consider the following factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other

symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 2016 WL 1119029 at *7.

The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.  *Goble v. Astrue*, 385 Fed. Appx. 588, 593 (7th Cir. 2010).  However, the ALJ need not mention every piece of evidence so long as he builds a logical bridge from the evidence to his conclusion.  *Id.*  Consequently, we will only reverse the ALJ's credibility finding if it is "patently wrong."  The ALJ's credibility determination is patently wrong if it lacks "any explanation or support."  *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Again, Claimant's issue with the ALJ's credibility determination here is that he simply did not make one.  To be clear, not even the Commissioner can dispute that the ALJ made no explicit statement explaining the weight he accorded Claimant's allegations, if any.  Instead, the Commissioner asks the Court to rule that the ALJ "implicitly found" that Claimant was not fully credible.  (Resp. at 4.)  On this record, the Court cannot oblige.

As explained above, Claimant testified to somewhat extreme functional limitations as a result of his fluctuating glucose levels and pain.  Specifically, among other things, he said that he could not walk for more than two blocks without difficulty, could stand for only a couple of minutes before needing to sit down, experienced pain after sitting for long periods, and could not lift even a gallon of milk.  He testified that he did not do any household chores or grocery shop, but left such tasks to his mother.

Although the ALJ summarized some of Claimant's allegations, he offered little in the way of explanation as to why he found those allegations to be incredible. Instead, he focused on the lack of medical objective evidence to support any such limitations. But, as stated above, this alone is not enough; and the ALJ gave short attention, if any attention, to the remaining factors to be considered under SSR 16-3p. *Knight*, 55 F.3d at 314. Without more, the Court cannot say that the ALJ offered sufficient support or explanation, and declines the Commissioner's request to read such an explanation into the record. *See* SSR 16-3p, 2016 WL 1119029, at *9 ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (commenting that nothing in SSR 96-7p, which is substantively in line with SSR 16-3p, "suggests that the reasons for a credibility finding may be implied."). As such, remand is appropriate for a proper assessment of Claimant's subjective symptoms.

Given this finding, we need not discuss Claimant's remaining arguments in much detail. The Court does express concern, as did the Claimant, regarding the ALJ's treatment of the agency consultants' recommendation that Claimant would be limited in his ability to reach overhead with his right upper extremity. This recommendation came along with the consultants' conclusion that Claimant could perform a range of medium work. Ultimately, the ALJ disagreed that the Claimant could perform medium work in light of his diabetes diagnosis. But, the ALJ did not otherwise elaborate why he did not

accept the consultants' more limited recommendation regarding overhead reaching, which could have affected his RFC. As that limitation was based on a physical exam by Dr. Youkhana, and the record before the ALJ included an additional reference to a shoulder problem, this shortcoming requires further attention.[3] In the same vein, the ALJ should take care to consider whether Claimant could in fact perform the position of bakery worker, which requires exposure to moving machinery, given his RFC conclusion that Claimant must avoid such machinery.

Lastly, Claimant takes issue with the Appeals Council's treatment of the subsequently submitted physical therapy records. On this issue, the parties dispute whether the Appeals Council's order is more in line with the language of *Perkins v. Chater*, 107 F.3d 1290 (7th Cir.1997) – and is not reviewable – or with *Farrell v. Astrue*, 692 F.3d 767 (7th Cir. 2012) and *Stepp v. Colvin*, 795 F.3d 711 (7th Cir. 2015) – and is subject to *de novo* review. For what it's worth, our review of the Appeals Council's order here and the case law reveals that the order is more akin to *Farrell* and *Stepp* and would be subject to *de novo* review. But, that is where we must part ways with Claimant because he has failed to properly argue why the physical therapy records were in fact "new" under the definition of "new and material" evidence. Evidence is considered new if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Stepp*, 795 F.3d at 725. The physical therapy records here certainly appeared to be in existence four months prior to the administrative hearing, and Claimant has failed to otherwise argue to the Court why the records were not available

---

[3] The Court acknowledges that the ALJ discussed Claimant's shoulder problem at step two when determining his severe impairments. However, in fashioning the RFC, the ALJ is obligated to consider all impairments, even those that are not severe. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). Given the evidence in the record, further analysis is required.

to him earlier.  *See Barth v. Colvin*, No. 13 CV 7788, 2015 WL 7180094, at *7 (N.D. Ill. Nov. 16, 2015) ("By failing to develop any argument regarding the newness of the evidence, Barth has waived the issue.").  In any event, having otherwise concluded that remand is appropriate on the basis of the evidence before the ALJ, we need not comment further.

### III.    CONCLUSION

For the reasons set forth above, Claimant's request for summary judgment is granted and the Commissioner's request for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.  It is so ordered.

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: June 14, 2017**